## No. 23-10578-C

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

————————

**UNITED STATES OF AMERICA,**
*Plaintiff/appellee,*

**v.**

**VICTOR GRANDIA GONZALEZ,**
*Defendant/appellant.*

————————

**On Appeal from the United States District Court
for the Southern District of Florida**

————————

**INITIAL BRIEF BY APPELLANT
VICTOR GRANDIA GONZALEZ**

————————

**MICHAEL CARUSO**
 **FEDERAL PUBLIC DEFENDER**
**ANDREW L. ADLER**
**ASHLEY KAY**
 **ASS'T FEDERAL PUBLIC DEFENDERS**
**Counsel for Appellant**
 **1 E. Broward Blvd., Suite 1100**
 **Ft. Lauderdale, FL 33301**
 **(954) 356-7436**

**THIS CASE IS ENTITLED TO PREFERENCE
(CRIMINAL CASE)**

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

### United States v. Victor Grandia Gonzalez
### Case No. 23-10578-C

Appellant files this Certificate of Interested Persons and Corporate

Disclosure Statement, as required by 11th Cir. R. 26.1.

Adler, Andrew L.

A.M.

Athena Insurance Agency, LLC

Bloom, Hon. Beth

C.D.

C.I.

Caruso, Michael

D. Family

D.M.

F.A.

G.A.

G.J.R.

G.K.A.

Gonzalez, Juan Antonio

Gonzalez, Victor Javier Grandia

Goodman, Hon. Jonathan

G.Y.

Hayes, Nadia

I.S.

J.G.

JHC Investgents LLC

Kay, Ashley Devon

Lapointe, Markenzy

M.A.

M.A.

M.D.

M.J.

Matzkin, Daniel

McAliley, Hon. Chris M.

Otazo-Reyes, Hon. Alicia M.

P.P.M.G.

P.Y.F.

Prestige Enterprises LLC

Reid, Hon. Lisette

R.Y.F.

R.Y.

Rubio, Lisa Tobin

Silverstein, Joan

Taylor, Kate

Thompson, Jeremy

Waxman, Abbie

United States of America

Y.P.

## STATEMENT REGARDING ORAL ARGUMENT

This appeal is from the denial of a motion to suppress. Florida police officers arrested Mr. Grandia Gonzalez without a warrant for loitering and prowling—a misdemeanor. As explained below, however, no law enforcement officer personally observed him commit that offense in their presence. Before stopping him, all they saw was a man walking down a residential street at 5:22 a.m. Thus, this appeal turns on a weighty but surprisingly unresolved question of constitutional law: does the Fourth Amendment prohibit the warrantless arrest for a misdemeanor where the offense is not committed in an officer's presence? Because that question of constitutional law is one of first impression in this Circuit, and because that question is important, oral argument is warranted here.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ................................................................ C-1

STATEMENT REGARDING ORAL ARGUMENT ................................... i

TABLE OF CITATIONS .......................................................... iii

STATEMENT OF JURISDICTION ................................................. 1

STATEMENT OF THE ISSUES ................................................... 2

STATEMENT OF THE CASE ..................................................... 3

    I.     Course of Proceedings & Disposition Below ............................ 3

    II.    Facts ...................................................................... 4

    III.   Standards of Review .................................................... 14

SUMMARY OF THE ARGUMENT ............................................... 15

ARGUMENT AND CITATIONS TO AUTHORITY ............................... 16

    A.    Mr. Grandia Gonzalez Did Not Commit the Misdemeanor Offense of Loitering or Prowling in an Officer's Presence ........ 17

        1.    Florida's Loitering and Prowling Statute ......................... 18

        2.    No Officer Observed a Violation of the Statute Here ....... 23

        3.    Conduct Reported by a Complainant—But Not Observed by an Officer—Cannot Be Considered ............. 29

        4.    The Offense Must Be Completed Before Police Action ..... 35

    B.    The Fourth Amendment Prohibits Warrantless Arrests for Misdemeanors Unless the Offense Is Committed in an Officer's Presence ..................................................... 42

        1.    The Common Law Is Dispositive ................................... 43

        2.    Contrary Authority Is Unpersuasive .............................. 50

CONCLUSION .................................................................. 53

CERTIFICATE OF COMPLIANCE ............................................. 54

CERTIFICATE OF SERVICE .................................................. 55

# TABLE OF CITATIONS

## CASES

*Atwater v. City of Lago Vista,*
    532 U.S. 318 (2001) ............................................................ 43, 47, 48, 49

*B.A.A. v. State,*
    356 So.2d 304 (Fla. 1978) ............................................................ 22, 28

*Bowser v. State,*
    937 So.2d 1270 (Fla. 2d DCA 2006) .................................... 25, 28, 37, 40

*Brown v. State,*
    314 So.2d 129 (Fla. 1975) ................................................................... 22

*C.H.S. v. State,*
    795 So.2d 1087 (Fla. 2d DCA 2001) ..................................................... 39

*Carroll v. United States,*
    267 U.S. 132 (1925) ...................................................................... 45, 46

*Chamson v. State,*
    529 So.2d 1160 (3d DCA 1988) ........................................................... 39

*D.A. v. State,*
    471 So.2d 147 (Fla. 3d DCA 1985) ............................................... *passim*

*D.S.D. v. State,*
    997 So.2d 1191 (Fla. 5th DCA 2008) ............................................. 25, 36

*E.B. v. State,*
    537 So.2d 148 (Fla. 2d DCA 1989) ........................................... 29, 36, 37

*E.C. v. State,*
    724 So.2d 1243 (4th DCA 1999) .................................................... 36, 37

*E.F. v. State,*
    110 So.3d 101 (Fla. 4th DCA 2013) .................................... 29, 32, 36, 37

*Freeman v. State*,
617 So.2d 432 (Fla. 4th DCA 1993) ....................................................28

*G.E.C. v. State*,
586 So.2d 1338 (Fla. 5th DCA 1991) ...................................................31

*Graves v. Mahoning Cnty.*,
821 F.3d 772 (6th Cir. 2016)...................................................50, 51, 52

*Hollingsworth v. State*,
991 So.2d 990 (Fla. 4th DCA 2008) ..............................................36, 37

*J.S. v. State*,
147 So.2d 608 (Fla. 4th DCA 2014) ........................................25, 34, 35

*J.S.B. v. State*,
729 So.2d 456 (Fla. 2d DCA 1999).........................................30, 32, 36

*John Bad Elk v. United States*,
177 U.S. 529 (1900)................................................................44, 45, 48

*Jones v. State*,
117 So.3d 818 (Fla. 4th DCA 2013) ..............................................25, 32

*K.R.R. v. State*,
629 So.2d 1068 (Fla. 2d DCA 1994)..............................................32, 39

*Knight v. Jacobson*,
300 F.3d 1272 (11th Cir. 2002).....................................................43, 50

*Kurtz v. Moffitt*,
115 U.S. 487 (1885)...................................................................*passim*

*L.C. v. State*,
516 So.2d 95 (Fla. 3d DCA 1987).......................................................28

iv

*Lange v. California*,
141 S. Ct. 2011 (2021) .............................................................. 48, 49, 51

*Lu Jing v. State*,
316 So.3d 724 (Fla. 4th DCA 2021) ..................................................... 33

*Madge v. State*,
160 So.3d 86 (Fla. 4th DCA 2015) .................................................. 30, 32

*Maryland v. Pringle*,
540 U.S. 366 (2003) ................................................................................ 50

*Papachristou v. City of Jacksonville*,
405 U.S. 156 (1972) ......................................................... 18, 19, 20, 26

*Patmore v. State*,
383 So.2d 309 (Fla. 2d DCA 1980) ...................................................... 29

*R.D.W. v. State*,
659 So.2d 1193 (Fla. 2d DCA 1995) .................................. 28, 36, 37, 38

*Springfield v. State*,
481 So.2d 975 (Fla. 4th DCA 1986) ............................................... 29, 31

*State v. Ecker*,
311 So.2d 104 (Fla. 1975) ............................................................ *passim*

*Stephens v. State*,
987 So.2d 182 (Fla. 2d DCA 2008) ................................................. 36, 37

*T.L.F. v. State*,
536 So.2d 371 (Fla. 2d DCA 1988) ...................................................... 32

*T.T. v. State*,
572 So.2d 21 (Fla. 4th DCA 1990) ................................................. 36, 39

*T.W. v. State,*
  675 So.2d 1018 (Fla. 2d DCA 1996)..........................................28, 37, 39

*Trupiano v. United States,*
  334 U.S. 699 (1948).................................................................................46

*United States v. Goings,*
  573 F.3d 1141 (11th Cir. 2009)............................................................42

*United States v. Gonzlaez-Zea,*
  995 F.3d 1297 (11th Cir. 2021)............................................................14

*United States v. Jones,*
  565 U.S. 400 (2012).................................................................................48

*United States v. Watson,*
  423 U.S. 411 (1976).................................................................46, 47, 48

*V.E. v. State,*
  539 So.2d 1170 (3d Cir. 1989)........................................................34, 39

*Virginia v. Moore,*
  553 U.S. 164 (2008)...........................................................42, 48, 50

*Von Goff v. State,*
  687 So.2d 926 (Fla. 2d DCA 1997).....................................................36

*Watts v. State,*
  463 So.2d 205 (Fla. 1985)......................................................20, 21, 22

*Welsh v. Wisconsin,*
  466 U.S. 740 (1984)................................................................................50

*Wilson v. Arkansas,*
  514 U.S. 927 (1995)................................................................................49

*Wyoming v. Houghton*,
    526 U.S. 295 (1999)...............................................................49


S<span>TATUTES</span>
18 U.S.C.
    § 1708 ...........................................................................3
    § 3231 ...........................................................................1
28 U.S.C. § 1291 ...................................................................1
1997 Fla. Sess. Law Serv. Ch. 97-102..................................20
Fla. Stat.
    § 775.082(4)(b)............................................................23
    § 856.02 .......................................................................20
    § 856.021 ..............................................................*passim*
    § 901.15(1)............................................................30, 42


R<span>ULES</span>
Fed. R. Crim. P. 11(a)(2) .......................................................3


O<span>THER</span> A<span>UTHORITIES</span>
Model Penal Code § 250.6 ....................................................20

Charles Reich,
    *Police Questioning of Law Abiding Citizens*,
    75 Yale L.J. 1161 (1966) ....................................................18

William A. Schroeder,
    *Warrantless Misdemeanor Arrests and the Fourth Amendment*,
    58 Mo. L. Rev. 771 (1993) .................................................52

Joseph Story,
    3 *Commentaries on the Constitution of the United States* (1833).......48

Henry David Thoreau,
    *Excursions* (1893).................................................................19

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 18 U.S.C. § 3231 because the defendant was charged with an offense against the laws of the United States. This Court has jurisdiction under 28 U.S.C. § 1291, which confers jurisdiction on the courts of appeals from final decisions of district courts. Mr. Grandia Gonzalez timely noticed an appeal on February 23, 2023 (DE 53) from the court's final judgment of February 10, 2023 (DE 52).

## STATEMENT OF THE ISSUES

Whether officers had probable cause to believe that Mr. Grandia Gonzalez committed—in their presence—the misdemeanor offense of loitering and prowling under Fla. Stat. § 856.021; and, if not, whether the Fourth Amendment prohibits the warrantless arrest for a misdemeanor where that offense is not committed in an officer's presence.

## STATEMENT OF THE CASE

### I.    COURSE OF PROCEEDINGS & DISPOSITION BELOW

Mr. Grandia Gonzalez was charged with four counts of possessing stolen mail, in violation of 18 U.S.C. § 1708. (DE 5). He moved to suppress evidence and statements based on a violation of the Fourth Amendment. (DE 23, 32, 34). At the conclusion of an evidentiary hearing, the district court denied the motion from the bench. (DE 37; DE 63:91–95).

Pursuant to a written plea agreement, Mr. Grandia Gonzalez pleaded guilty to one of the four counts, and in exchange the government agreed to dismiss the remaining three. (DE 45:1 ¶ 1; DE 74). In the plea agreement, the parties "agree[d] that pursuant to Fed. R. Crim. P. 11(a)(2), the Defendant reserve[d] his right to appeal the District Court's Order denying Defendant's Motion to Suppress." (DE 45:1 ¶ 2). The parties further agreed that this issue was case dispositive, such that "should the Defendant prevail on appeal, he shall be allowed to withdraw/vacate his plea of guilty to the Indictment." (*Id*. at 2 ¶ 3).

The factual proffer accompanying the plea agreement recounted that, "[o]n July 6, 2022, Miami Dade Officers arrested Mr. Grandia Gonzalez for loitering and prowling, and then searched the black

3

backpack in the defendant's possession and located 37 pieces of sealed mail in the backpack that were not addressed to the defendant. The defendant admitted to officers that he had been walking in the residential area removing the mail from mailboxes" without permission. (DE 44).

At sentencing, the parties agreed that Mr. Grandia Gonzalez was subject to an advisory guideline range of 0–6 months. (DE 62:5; PSI ¶ 66). Recognizing that he had "no criminal history," he had been "battling the substance abuse" that "directly led to the commission of this offense," and he had made a "compelling statement" expressing remorse, the district court sentenced him to time served, followed by two years of supervised release. (DE 62:13–18; *see* PSI ¶¶ 27–28 (reflecting no criminal history)).

## II.  FACTS

To contextualize the proceedings below, it is necessary to provide some brief background on Florida's loitering and prowling statute: Fla. Stat. § 856.021. That misdemeanor offense has two elements: it is "unlawful for any person to [1] loiter or prowl in a place, at a time or in a manner not usual for law-abiding individuals, [2] under circumstances that warrant a justifiable and reasonable alarm or immediate concern for the safety of persons or property in the vicinity." Fla. Stat. § 856.021(1).

4

As to the second element, the statute provides that flight, refusal to identify oneself, and concealing oneself or an object are factors that may be considered in determining whether the requisite alarm or immediate concern is warranted. Fla. Stat. § 856.021(2). Unless flight or other circumstances make it impracticable, the officer must afford the person an opportunity to dispel the alarm before making an arrest. *Id*.

### A.    The Pleadings

**1.**    In his motion to suppress (DE 23), Mr. Grandia Gonzalez advanced a straightforward, two-part argument: (1) the Fourth Amendment prohibits a warrantless arrest for a misdemeanor unless it is committed in an officer's presence (*id*. at 2–3); and (2) here, Mr. Grandia Gonzalez did not commit the Florida misdemeanor offense of loitering or prowling in an officer's presence because the only thing that the officers personally observed was him walking down a residential street (*id*. at 3). As a result, the warrantless arrest was unlawful, the search incident to that arrest was therefore invalid, and the evidence and statements obtained as a result of that search should be suppressed. (*Id*.)

**2.**    In response (DE 32), the government agreed that Mr. Grandia Gonzalez was "arrested for loitering or prowling, pursuant to Fla. Stat.

5

§ 856.021." (*Id.* at 2). The government also agreed that, before stopping Mr. Grandia Gonzalez, the officers merely saw him walking down a residential street at 5:22 a.m. (*Id.*). And the government appeared to agree that the Fourth Amendment prohibits a warrantless arrest for a misdemeanor unless the offense occurs in an officer's presence. (*Id.* at 3).

However, in arguing that the officers had probable cause to believe that he was loitering and prowling, the government relied on information that was relayed to the officers—namely, the observations of a complainant who called the police—which went beyond what the officers themselves had observed. (*Id.* at 4). The government further argued that, based on the officers' conversation with Mr. Grandia Gonzalez, he failed to dispel the officers' alarm or immediate concern. (*Id.* at 5–6).

**3.** In reply (DE 34), Mr. Grandia Gonzalez reiterated that the officers could not make the warrantless arrest for loitering and prowling unless that misdemeanor was committed in their presence. Yet, he repeated, the officers merely observed him walking down the street at 5:22 a.m., and that conduct did not constitute loitering and prowling under Florida law. (*See id.* at 1–5). He reiterated that the court could not

consider the information relayed by the complainant because "[n]othing the complainant stated was observed by the officers." (*Id*. at 3).

Furthermore, he added, while the officers did observe Mr. Grandia Gonzalez during their conversation with him, Florida law made clear that the actual loitering and prowling had to occur before there was any police action. Thus, it did not matter whether Mr. Grandia Gonzalez failed to dispel the officers' alarm because they did not personally observe any loitering and prowling in the first place. And, under Florida law, his response to the officers' questions could not retroactively convert walking down the street into loitering and prowling. (*See id*. at 2–7).

### B.    The Evidentiary Hearing

**1.**    The facts of the case were undisputed. At the evidentiary hearing, the government called two Miami Dade police officers: Officers Sanchez and Exantus. Their testimony, along with body camera video footage played at the hearing, revealed the following undisputed facts.

On July 6, 2022, a Miami resident called 911. (DE 63:14). Officers Sanchez and Exantus were dispatched to the complainant's location. (*Id*. at 6, 14, 26). Dispatch advised the officers that there was "white male casing the area" who was last seen heading westbound. (*Id*. at 14).

7

Possessing only that information, Officer Sanchez began canvassing the area in his police car. (*Id.* at 6–7, 14, 16). Nearby, he saw a man walking down the middle of a residential street. (*Id.* at 7, 9, 14–15). It was at 5:22 a.m. (*Id.* at 15). Officer Sanchez did not see anything else. (*Id.* at 16–17).

However, because the man matched the complainant's description of a white male, Officer Sanchez stopped him. (*Id.* at 7, 15–16). Upon making contact, Sanchez observed that the man was wearing black clothing; he was carrying a water bottle with liquid (which the man later said was red wine); he had shiny metal object on the left side of his pocket; and he was carrying a backpack. (*Id.* at 10, 29, 40, 45). The man was sweating, as if he had been walking around for a while. (*Id.* at 38–39). He also appeared nervous. Officer Sanchez told the man to calm down because he just wanted to ask him basic questions. (*Id.* at 7, 13).

Exiting his vehicle but keeping a distance, Officer Sanchez asked if the man lived in the area and why he was walking down the street. (*Id.* at 7, 9, 17, 21–22). The man responded that he lived at The Crucero. (*Id.* at 9). While the officer initially thought that this referred to a cruise ship, the man clarified that he was living out of his car parked at a restaurant called The Crucero, which was 8–10 blocks away. (*Id.* at 9–11, 17–18, 50–

8

51). As for why he was walking down the street, the man responded simply that he thought he was allowed to do so. (*Id*. at 12–13, 18).

As that was happening, Officer Exantus met with the complainant. The complainant told Officer Exantus that, while his wife was walking their dog, she saw a Latin male with a backpack in black clothes looking into mailboxes; she saw him come out of a gate of a house where the owners were away; and the man had concealed himself in between cars after noticing the complainant's wife. (*Id*. at 27, 33–35, 41–42, 47–48).

Officer Exantus was then advised that Officer Sanchez had located the suspect and proceeded to his location, a couple of streets down. (*Id*. at 27–28, 35, 43). Upon his arrival, Officer Exantus first asked the man if he had a weapon; he responded that he did not. Officer Exantus then patted him down for officer safety and found a pair scissors on his waistband. (*Id*. at 28, 36–37, 43, 50). When asked why he was walking around, the man responded that he couldn't sleep. (*Id*. at 51). The officers then asked if the man had identification. The man responded that his ID was in his car, but he told them that his name was Victor Grandia, and he volunteered a picture of his ID on his phone. (*Id*. at 18–19, 28, 37, 44, 49, 51–53). In addition to confirming his name, the ID also showed that

9

Mr. Grandia Gonzalez was from another county 30 minutes away. That fact failed to dispel Officer Exantus's alarm, which had arose from the complainant's report of a man looking into mailboxes. For that reason, he placed Mr. Grandia Gonzalez under arrest for loitering and prowling. (*Id*. at 20, 28–30, 39, 53). Exantus then conducted a search incident to arrest and found stolen mail, a federal offense. (*Id*. at 20, 30, 39–40, 53).

  **2.** Based on those facts, the parties presented their arguments.

  Mr. Grandi Gonzalez repeated—at great length—the argument made in his written pleadings: the Fourth Amendment prohibited the officers from making a warrantless arrest for a misdemeanor unless that offense was committed in their presence; and, here, the only thing that they themselves observed was Mr. Grandia Gonzalez walking down the middle of a residential street at 5:22 a.m., which was not loitering and prowling under Florida law. The court pressed him on why it could not consider the information that the officers had received from the complainant. He responded that, even if the complainant was reliable, the officers themselves had not observed the conduct the complainant had reported, and so no loitering or prowling occurred in their presence. Moreover, under Florida law, anything that happened after Officer

10

Sanchez made contact could not be used to retroactively transform walking down the street into loitering or prowling. He concluded that, while the officers could have issued a notice to appear for the misdemeanor offense, they could not have made a formal arrest, and thus could not have conducted a search incident to arrest. (*See id*. at 55–79).

The government did not dispute that walking down the street was not loitering and prowling. When asked what else the officers themselves observed, the government mentioned only that Mr. Grandia Gonzalez was the only one in the area, sweating, nervous, wearing black, carrying a plastic water bottle, and later found with scissors. (*Id*. at 82, 84). Presumably because that was not enough, the government was forced to argue that "the officers [we]re allowed to rely on complainants who are at the scene," and that Mr. Grandia Gonzalez matched the complainant's description of a man stealing mail and concealing himself between cars. According to the government, that second-hand information—supplied by the complainant on the scene—is what distinguished this case from other cases that Mr. Grandia Gonzalez had cited. (*Id*. at 81–82, 84–85, 89–90). The government further argued that he failed to dispel the

11

officers' alarm because he could not explain why he was there, and his ID showed that he did not live in the area. (*Id*. at 83, 90–91).

Mr. Grandia Gonzalez replied that what the officers heard from the complainant did not occur in their presence, and thus could not support probable cause to believe that he had committed loitering or prowling. He cited several Florida cases all making that same basic point, including one that prohibited officers from relying on video surveillance because the conduct had not occurred in the officers' presence. (*See id*. at 85–89).

### C.    The District Court's Ruling

The court found that the officers arrested Mr. Grandia Gonzalez for loitering or prowling. (*Id*. at 83). And it agreed that, because that was a misdemeanor, the elements of that offense "must be committed in the officers' presence prior arrest." (*Id*. at 92). Nonetheless, in denying the motion, the court relied heavily on information that had been observed only by the complainant—and not by the officers—to find probable cause.

As for what the officers observed, the court found that they saw Mr. Grandia Gonzalez walking down the middle of a residential street at 5:20 a.m., it was dark, and he was sweaty and nervous. The court emphasized, however, that he matched the description given by the

12

complainant, who remained on the scene and told the officers that there was a man looking in mailboxes and concealing himself between cars. The court acknowledged that, "while that wasn't the officer's observation, I believe that the officer can certainly take the information provided to match the description." (*Id*. at 92–94). Based on that information, observed only by the complainant, the court found probable cause to believe that Mr. Grandia Gonzalez committed loitering and prowling.

The court further found that, because Mr. Grandia Gonzalez did not explain why he was in the area, and his ID showed that he lived in another county, he failed to dispel the officers' alarm. The court acknowledged that he did not flee, conceal himself, or fail to identify himself, and thus the alarm was not presumed. But he nonetheless failed to dispel the alarm in his conversation with the officers. (*Id*. at 95–96).

For those reasons, the court found that there was probable cause to believe that Mr. Grandia committed the misdemeanor offense of loitering and prowling. Accordingly, the court denied the motion. (*Id*. at 95). It subsequently memorialized that oral ruling in a paperless order. (DE 37).

13

### III.   STANDARDS OF REVIEW

"Because rulings on motions to suppress involve mixed questions of fact and law, [this Court] review[s] the district court's factual findings for clear error and its application of the law to the facts *de novo*. [This Court] construe[s] the facts in the light most favorable to the party that prevailed below, here, the government." *United States v. Gonzlaez-Zea*, 995 F.3d 1297, 1301 (11th Cir. 2021) (quotation omitted).

## SUMMARY OF THE ARGUMENT

Mr. Grandia Gonzalez moved to suppress evidence and statements obtained from a search incident to a warrantless misdemeanor arrest.

The officers arrested Mr. Grandia Gonzalez for loitering and prowling, a misdemeanor offense in Florida. But all the officers personally observed him do was walk down a residential street at 5:22 a.m. Florida law and common sense makes clear that such conduct does not violate the loitering and prowling statute. Thus, to salvage the arrest, the government and district court had to rely on conduct observed by a complainant. But the officers *themselves* observed none of that conduct.

Thus, the dispositive question here becomes: does the Fourth Amendment prohibit a warrantless arrest for a misdemeanor that is not committed in an officer's presence? Although that question is one of first impression in both the Supreme Court and this Court, Supreme Court precedent effectively resolves it. That is because the Supreme Court has repeatedly recognized for over a century that the common law contained an "in-the-presence" requirement for misdemeanor arrests. And the Supreme Court has held that the Fourth Amendment cannot be less protective than the common law. The order below should be reversed.

15

## ARGUMENT AND CITATIONS TO AUTHORITY

Mr. Grandia Gonzalez renews his argument below: the warrantless arrest violated the Fourth Amendment because the misdemeanor offense of loitering and prowling was not committed in an officer's presence. Thus, the search incident to that arrest was invalid. And the evidence and statements obtained as a result should have been suppressed.

The district court stated that, because loitering and prowling was a misdemeanor, the offense must be committed in the officers' presence. (DE 63:92). But if that is true, then Mr. Grandia Gonzalez must prevail because the only thing the officers observed him do was walk down a residential street at 5:22 a.m. And that conduct does not come close to satisfying the elements of loitering and prowling under Florida law.

Unable to dispute that, the district court accepted the government's invitation to rely on the conduct that was observed by the reporting complainant. But, as he explained below, the officers themselves did not observe that conduct; it did not occur in their presence. All they saw was him walking down the street. And Florida law is crystal clear that this conduct does not constitute loitering or prowling. Florida law is equally clear that the offense must completed before there is any police action.

The only way, then, to affirm the conviction here is to conclude that the Fourth Amendment *does* in fact allow warrantless arrests for misdemeanors, even when they are not committed in an officer's presence. Although neither the district court nor the government disputed that point below, it is an open question in this Circuit. And because that question is dispositive here, the Court must address it head on. In doing so, the Court should hold that, because the common law required misdemeanors to occur in an officer's presence before an arrest could be made, that is what the Fourth Amendment requires as well.

## A. Mr. Grandia Gonzalez Did Not Commit the Misdemeanor Offense of Loitering or Prowling in an Officer's Presence

Walking down a residential street at 5:22 a.m. does not violate Florida's loitering and prowling statute. It's really that simple here, for that is all the responding officers personally saw Mr. Grandia Gonzalez do before they stopped him. As explained here in Part A, dozens of Florida cases make clear that no loitering or prowling was actually committed in an officer's presence in this case. Therefore, the officers lacked authority to arrest him—provided that the Fourth Amendment itself prohibits warrantless arrests for misdemeanors that are not committed in an officer's presence. As explained below in Part B, it does.

17

### 1.    Florida's Loitering and Prowling Statute

**a.**    Florida's loitering and prowling statute was enacted in direct response to *Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972). In that case, the Supreme Court declared void for vagueness a Jacksonville, Florida vagrancy ordinance. As relevant here, the Court observed that "the ordinance makes criminal activities which by modern standards are normally innocent," such as being a "habitual wanderer or . . . common night walker[ ]." *Id*. at 163 (quotation marks omitted). The Court drew on common human "experience that sleepless people often walk at night, perhaps hopeful that sleep-inducing relaxation will result." *Id*.

More fundamentally, though, the Court emphasized that wandering and strolling "have been in part responsible for giving our people the feeling of independence and self-confidence, the feeling of creativity." *Id*. at 164. The Court quoted the late law professor Charles Reich: "If I choose to take an evening walk to see if Andromeda has come up on schedule, I think I am entitled to look for the distant light of Almach and Mirach without finding myself staring into the blinding beam of a police flashlight." *Id*. at 164 n.6 (quoting Reich, *Police Questioning of Law Abiding Citizens*, 75 Yale L.J. 1161, 1172 (1966)).

18

Such "amenities of life," the Court continued, "have been extolled by," and "embedded" in the works of, great writers—naming Walt Whitman, Vachel Lindsay, and Henry David Thoreau. *Id*. For example, the Court noted, Thoreau once wrote: "I have met with but one or two persons in the course of my life who understood the art of Walking, that is, of taking walks—who had a genius, so to speak, for sauntering . . . . He who sits still in a house all the time may be the greatest vagrant of all; but the saunterer . . . is no more vagrant than the meandering river, which is all the while sedulously seeking the shortest course to the sea." *Id*. at 164 n.7 (quoting Thoreau, *Excursions* 251–52 (1893)).

Such saunterers, however, could be ensnared by the Jacksonville ordinance based on the arbitrary preferences of police and judges. Thus, "[t]hose generally implicated by the imprecise terms of the ordinance— poor people, nonconformists, dissenters, idlers—may be required to comport themselves according to the life style deemed appropriate by the Jacksonville police and the courts." *Id*. at 170. The Court concluded that "[a] presumption that people who might walk or loaf or loiter or stroll or frequent houses where liquor is sold . . . are to become future criminals is too precarious for a rule of law." *Id*. at 171. And "[t]he rule of law,

19

evenly applied to minorities as well as majorities, to the poor as well as the rich, is the great mucilage that holds society together." *Id*.

**b.**    Mere months after *Papachristou*, the Florida Legislature enacted a new statute—Fla. Stat. § 856.021—patterned on Model Penal Code § 250.6 "in an attempt to cure the infirmities of [its] earlier loitering law." *State v. Ecker*, 311 So.2d 104, 107 (Fla. 1975); *accord Watts v. State*, 463 So.2d 205, 206 (Fla. 1985) ("The legislature enacted the present loitering and prowling statute to cure the previous law's constitutional defects."). In *Papachristou*, the Supreme Court noted that the earlier statute, Fla. Stat. § 856.02, had been struck down by one federal court and had "read[ ] quite closely on the Jacksonville ordinance" that the Supreme Court proceeded to strike down. 405 U.S. at 157 n.2. Florida's post-*Papachristou* loitering and prowling statute is the one at issue here.[1]

Three years after § 856.021's enactment, the Florida Supreme Court in *Ecker* upheld the constitutionality of the statute, "subject to the conditions and limitations herein expressed." 311 So.2d at 106. On the one hand, the Court "recognize[d] that if the statute broadly proscribed

---

[1] The Florida Legislature amended the statute in 1997 to make it gender-neutral. 1997 Fla. Sess. Law Serv. Ch. 97-102 § 1384. But it has otherwise remained unchanged since its original enactment in 1972.

loitering or idling, without more, as in the manner of our previous statute, it would be unconstitutional. On the other hand, it is recognized that if a statute proscribes loitering that threatens public safety or a breach of the peace, it can withstand constitutional attack." *Id*. at 107. Accordingly, the Court emphasized that the statute must be confined to "circumstances where peace and order are threatened or where the safety of persons or property is jeopardized. *Id*. at 109. Indeed, the "[w]hole purpose of the statute is to provide law enforcement with a suitable tool to prevent crime and allow a specific means to eliminate a situation which a reasonable man would believe could cause a breach of the peace or a criminal threat to persons or property." *Id*. at 110.

Following *Ecker*, the Florida Supreme Court has re-affirmed the constitutionality of the statute. *See, e.g.*, *Watts*, 463 So.2d at 207. But Florida courts have recognized that "[t]he statute . . . plainly reaches the outer limits of constitutionality and must be applied by the courts with special care so as to avoid unconstitutional applications." *D.A. v. State*, 471 So.2d 147, 153 (Fla. 3d DCA 1985) (citing *Ecker*). That includes the Florida Supreme Court itself, which has emphasized that "[t]he statute is not to be used as a 'catchall' provision [w]hereby citizens may be

21

detained by police and charged by prosecutors when there is an insufficient basis to sustain a conviction on some other charge. Rather, it is a specific prohibition against specific conduct." *B.A.A. v. State*, 356 So.2d 304, 306 (Fla. 1978). To remain within constitutional bounds, the Florida Supreme Court has "cautioned that the conduct of the defendant must reflect circumstances sufficient to establish a threat to the public safety," *Brown v. State*, 314 So.2d 129, 129 (Fla. 1975)—not mere idling.

**c.** As for the text of the statute, subsection (1) makes it "unlawful for any person to loiter or prowl in a place, at a time or in a manner not usual for law-abiding individuals, under circumstances that warrant a justifiable and reasonable alarm or immediate concern for the safety of persons or property in the vicinity." Fla. Stat. § 856.021(1). In *Ecker*, the Florida Supreme Court explained that this statutory provision "contains two elements: (1) loitering or prowling in a place at a time and in a manner not usual for lawabiding individuals, and (2) such loitering and prowling were under circumstances that threaten the public safety. Proof of both elements is essential in order to establish a violation of the statute." 311 So.2d at 110; *accord id.* at 106, 111; *Watts*, 463 So.2d at 206.

Subsection (2) relates only to the second element. That provision enumerates "circumstances which may be considered in determining whether such alarm or immediate concern is warranted." § 856.021(2). Such alarm or immediate concern is "presumed under the statute if, when a law officer appears, the defendant flees, conceals himself, or refuses to identify himself." *Ecker*, 311 So.2d at 106. But an "officer shall, prior to any arrest for an offense under this section, afford the person an opportunity to dispel any alarm or immediate concern which would otherwise be warranted by requesting the person to identify himself or herself and explain his or her presence and conduct." § 856.021(2). "If the accused voluntarily explains his presence and such explanation dispels the alarm, no charge can be made." *Ecker*, 311 So.2d at 110.

Subsection (3) makes loitering and prowling a second-degree misdemeanor. Fla. Stat. § 856.021(3). In Florida, such offenses are punishable by up to 60 days in prison. Fla. Stat. § 775.082(4)(b).

## 2.    No Officer Observed a Violation of the Statute Here

In this case, the only conduct that Mr. Grandia Gonzalez committed in an officer's presence was walking down the middle of a residential street at 5:22 a.m. That's all Officer Sanchez saw before he made contact.

23

(DE 63:16–17). Florida case law could not be more clear that this conduct does not satisfy either of the offense elements for loitering and prowling.

    **a.**    The seminal Florida case outlining the elements is *D.A. v. State*, 471 So.2d 147 (3d DCA 1985), which relied on the Florida Supreme Court's decision in *Ecker* and commentary to the Model Penal Code.

    *D.A.* explained: "As for the first element, it must be established that the defendant engaged in incipient criminal behavior which law-abiding people do not usually engage in due to the time, place, or manner of the conduct involved. The gist of this element is aberrant and suspicious criminal conduct which comes close to, but falls short of, the actual commission or attempted commission of a substantive crime. It does not, however, involve behavior which constitutes no threat of immediate, future criminal activity." *Id*. at 151. In other words, "this element . . . is not directed at non-aberrant, harmless behavior which, by its very nature, poses no threat of immediate future criminal activity." *Id*. at 152.

    Here, this first element was clearly not satisfied. Walking down a residential street at 5:22 a.m. is not unusual for law-abiding citizens. After all, that is how many law-abiding citizens get their exercise. That is how they battle insomnia. And that is how they get to work or school.

Even the complainant's wife was out at that hour walking the dog when she saw Mr. Grandia Gonzalez. And this conduct does not even remotely resemble "aberrant and suspicion criminal conduct which comes close to, but falls short of, the actual commission or attempted commission of a substantive offense." *D.A.*, 471 So.2d at 151. Nor does it pose a "threat of immediate, future criminal activity." *Id*. This is just common sense.

Florida case law expressly confirms that one's "presence in a residential neighborhood early in the morning, without more, does not support the charge." *D.S.D. v. State*, 997 So.2d 1191, 1193 (Fla. 5th DCA 2008). Indeed, "[b]eing out on the street, in itself, is plainly harmless behavior and, without more, poses no threat of immediate future criminal activity." *D.A.*, 471 So.2d at 152. Rather, Florida cases show that the first element requires *much* more than what Officer Sanchez observed here.[2]

---

[2] *See, e.g.*, *J.S. v. State*, 147 So.2d 608, 609–10 (Fla. 4th DCA 2014) (evidence insufficient on first element where an "officer was responding to a report of a 'burglary in progress' at 4:00 in the morning in a residential neighborhood when he came upon Appellant walking in the area," and he "then took off running"); *Jones v. State*, 117 So.3d 818, 822 (Fla. 4th DCA 2013) (evidence "insufficient to prove that the defendant was about to commit a crime" where officers observed that: "(1) the men were in a residential area that they admittedly did not live in; at 12:30 a.m.; (2) they began walking in the other direction when the officer approached; and, (3) the men appeared nervous"); *Bowser v. State*, 937 So.2d 1270, 1271 (Fla. 2d DCA 2006) (evidence insufficient on first

At the risk of belaboring this uncontroversial point: if the Florida statute criminalized mere idling or sauntering before dawn, then that would revive the very same constitutional problems that plagued the Jacksonville ordinance in *Papachristou*. Yet the Florida Legislature enacted § 856.021 in order to cure those constitutional problems. And the Florida Supreme Court in *Ecker* strictly construed the statute in order to avoid such problems. In short, if the statute encompassed merely walking down the street, it would be unconstitutional. It plainly does not, and no Florida case has held, much less suggested, that it does. In short, Officer Sanchez did not observe Mr. Grandia Gonzalez commit any conduct in his presence that comes even close to satisfying the first offense element.

> **b.**    Although academic here, the second element was absent too.

"As to the second element, which is the heart of the offense, it must be established that the defendant engaged in conduct that warranted a justifiable or reasonable alarm or immediate concern for the safety of persons or property in the vicinity. The gist of this element is that the aberrant or incipient criminal behavior . . . must be alarming in nature;

---

element where defendant and three others were in a dark parking lot at 2:00 a.m. because most places in the area were open until 3:00 a.m.).

26

that is, it must threaten the physical safety of persons in the area or the safety of property in the area. It is not enough that the subject criminal behavior point towards the commission or attempted commission of any type of substantive crime; it must point toward the commission or attempted commission of a crime against a person or a crime against certain property in the vicinity. It must, in a word, amount to an imminent breach of the peace or an imminent threat to public safety." *D.A.*, 471 So.2d at 152 (citing *Ecker*, 311 So.2d at 109–10).

Here, as explained, the conduct that Officer Sanchez observed was not aberrant or incipient criminal behavior *at all*. It follows, then, that it could not be incipient criminal behavior that was so "alarming in nature" so as to imminently threaten a breach of the peace or public safety. In short, where the first element is not met, neither is the second element.

That is particularly true here. As the district court found (DE 63:94–95), Mr. Grandia Gonzalez did not attempt to flee, conceal himself, or refuse to identify himself. Those three factors are specifically enumerated in the statute. And their absence here "tend[s] to negate the second element." *D.A.*, 471 So.2d at 154. In fact, Mr. Grandia Gonzalez shared his name and volunteered a picture of his ID on his phone.

27

Nor did Officer Sanchez otherwise observe Mr. Grandia Gonzalez engage in suspicious behavior before stopping him. Again, all he saw was a white man walking down the street. Yet numerous Florida cases have held that this second element is not satisfied even where circumstances *are* highly suspicious—but still do not "amount to an imminent breach of the peace or an imminent threat to public safety." *D.A.*, 471 So.2d at 152. Just a handful of exemplar cases are cited in the footnote below.[3]

---

[3] *See, e.g.*, *B.A.A.*, 356 So.2d at 305–06 (no threat to public peace or safety where "a police officer observed [the defendant], a number of times, approaching cars stopped at a traffic light and engaging the drivers in conversation. The arresting officer observed the [defendant] acting in this manner on approximately forty previous occasions, and on the night of her arrest had earlier warned her to leave the streets"); *Bowser*, 937 So.2d at 1271–72 (second element not satisfied where defendant and others were looking inside unoccupied cars in a dark parking lot at 2:00 a.m.); *T.W. v. State*, 675 So.2d 1018, 1019 (Fla. 2d DCA 1996) ("an officer saw T.W., then age 17, walking next to a pawn shop at 4 a.m. carrying a case which the officer recognized as containing a chain saw"); *R.D.W. v. State*, 659 So.2d 1193, 1193–94 (Fla. 2d DCA 1995) (defendant and two others rode their bikes at 9:20 p.m. through grocery store parking lots, scanned the lots, hid their bikes in bushes, and watched cars and people, while wearing jackets in August); *Freeman v. State*, 617 So.2d 432, 432–33 (Fla. 4th DCA 1993) (officer responding to complaint at 3:20 a.m. saw two men jump over a high wall and run when they saw the officer); *L.C. v. State*, 516 So.2d 95, 96–97 (Fla. 3d DCA 1987) (defendant was "riding a bicycle in a shopping center parking lot" at 10:10 p.m., "there had been a number of purse-snatchings in the area," he "rode up and down three times looking into the store windows," and he "stopped and pulled or pushed on the door of a closed department store").

**c.**    In short, a legion of Florida cases—more are noted in both the margin here[4] and in the argument below—have held that conduct far less innocuous and far more suspicious than the conduct here did not violate the statute. Because the facts here are undisputed, and because Florida case law is clear, the conclusion is clear too: no officer observed Mr. Grandia Gonzalez commit loitering and prowling in their presence.

## 3.    Conduct Reported by a Complainant—But Not Observed by an Officer—Cannot Be Considered

Notably, neither the district court nor the government disputed that the officers themselves did not observe a violation the statute. In an

---

[4] *See, e.g.*, *E.F. v. State*, 110 So.3d 101, 104–05 (Fla. 4th DCA 2013) (evidence insufficient on both elements where officers observed "that, around 9:00 in the morning, the [defendant] was (1) walking slowly while looking into carports and sides of houses in an area where burglaries had occurred, and (2) carrying a large satchel bag along with a yellow flashlight hanging out of his pants pocket"); *E.B. v. State*, 537 So.2d 148, 149–50 (Fla. 2d DCA 1989) (evidence insufficient on both elements where defendant "and a friend were riding bicycles at approximately 2:45 a.m. When they saw an officer behind them, they abruptly turned and almost lost control of their bikes."); *Springfield v. State*, 481 So.2d 975, 978–79 (Fla. 4th DCA 1986) (reversing where "[t]he officer himself observed only that appellant was walking with a staggering gait on a public sidewalk at 10:40 p.m. and that he was carrying a tape recorder and may have been drinking"); *Patmore v. State*, 383 So.2d 309, 310 (Fla. 2d DCA 1980) (evidence insufficient where the defendant was "walking . . . at about 9:00 p.m. one evening when a police car followed by a police van [looking for robbery suspects] passed him. He reacted peculiarly, turning around and walking hurriedly away. Eventually he broke into a run.").

29

effort to salvage the arrest, they were forced to rely on conduct that the *complainant* observed—namely, that his wife had seen a man looking into mailboxes and concealing himself between cars. Even assuming that this conduct could violate the statute, the district court expressly acknowledged "that [this conduct] wasn't the officer's observation." (DE 63:94). Nonetheless, the district court still relied heavily on the complainant's account to find probable cause. The court emphasized that the complainant was on the scene, and the officers relied on his wife's account and observations to match Mr. Grandia Gonzalez to the suspect's description. (*Id*. at 92–94). But that emphasis is puzzling, for it does not change the key fact: the loitering and prowling that the complainant's wife observed and reported was not committed in any officer's presence.

**a.** Under Florida law, officers may not make a warrantless arrest for a misdemeanor unless the offense is committed in their presence. Fla. Stat. § 901.15(1). Florida courts have consistently applied that requirement to the loitering and prowling statute.[5] As argued in Part

---

[5] *See, e.g.*, *Madge v. State*, 160 So.3d 86, 89 (Fla. 4th DCA 2015) ("The bottom line is law enforcement must observe the conduct necessary to establish the two elements of loitering and prowling."); *J.S.B. v. State*, 729 So.2d 456, 457 (Fla. 2d DCA 1999) ("because the crime [of loitering and prowling] is a misdemeanor, the elements of the offense must occur

B below, Mr. Grandia Gonzalez maintains that this requirement is also mandated by the Fourth Amendment. Here, however, he simply observes that numerous Florida cases applying the state-law requirement confirm what common sense makes clear: the complainant's observations did not occur "in an officer's presence." And that fact does not change merely because officers saw someone matching a complainant's description.

Confirming that factual reality, Florida courts have consistently held that conduct observed only by a complainant cannot be used to satisfy the offense elements. In *Madge*, for example, the appellate court reversed a conviction "because the responding officers did not personally observe any type of behavior that appeared to be on the verge or ripening into a criminal act." 160 So.3d at 87. Instead, the state's case rested on the account of the victim, who testified that the defendant approached her car and pulled on the door handle. *Id*. But because the officers

---

in the officer's presence"); *G.E.C. v. State*, 586 So.2d 1338, 1340 (Fla. 5th DCA 1991) ("Since loitering and prowling is a misdemeanor offense, all of the elements of the offense must occur in the presence of the arresting officer to constitute a legal arrest."); *Springfield v. State*, 481 So.2d 975, 977 (Fla. 4th DCA 1986) ("[S]ince loitering and prowling is a misdemeanor, only the officer's own observations may be considered in determining whether probable cause exists to make a warrantless arrest"). There are many more Florida cases recognizing this proposition.

31

themselves did not "personally observe[ ] any alarming conduct which presented an immediate concern for the safety of persons or property," the evidence was legally insufficient. *Id*. at 90 (quotation marks omitted).

Numerous loitering and prowling cases likewise refuse to consider a complainant or witness account (even when reporting highly suspicious activity), where the officers themselves did not personally observe it.[6] In

---

[6] *See, e.g.*, *Jones*, 117 So.3d at 820, 822 ("Because only the officer's observations may be considered, the witnesses' report of individuals knocking on their door cannot be considered," even though officers "arrived in the area within two to three minutes and saw two men walking down the street about five houses away"); *E.F.*, 110 So.3d at 103–04 (refusing to consider testimony by a "concerned citizen" who "had observed the [defendant] look at a vacant house, look across from the vacant house to his neighbor's house, and walk around his neighbor's house"); *J.S.B.*, 729 So.2d at 457 (reversing conviction where officer himself merely observed defendant and others walking 20 feet behind a building, even though there had been a report of a burglary at the building); *K.R.R. v. State*, 629 So.2d 1068, 1069–70 (Fla. 2d DCA 1994) (reversing conviction where an officer merely observed the defendant walking on railroad tracks at 12:30 a.m., even though that observation came ten minutes after someone reported an automobile theft 300 yards away); *T.L.F. v. State*, 536 So.2d 371, 372 (Fla. 2d DCA 1988) (where officer observed the defendant "conversing with two other individual during business hours," "made no attempt to flee or conceal himself," and "his shirtless attire was not unusual for Florida and certainly not unlawful," probable cause could not be supplied from a "statement by a [business] employee at the scene identifying appellant as a suspect in the recent burglary"); *Springfield*, 481 So.2d at 978 ("since the officer could rely only on his own observations, he could not base his decision in any way on the report of the two witnesses that a black male carrying something had been observed in their backyard").

fact, Florida courts will not even consider video surveillance—a highly reliable form of evidence—where the officers themselves did not contemporaneously observe the conduct depicted in the video. *See Lu Jing v. State*, 316 So.3d 724, 731 (Fla. 4th DCA 2021) ("Although Officer Molinaro viewed surveillance footage and photographs of the [trespass] incident, such after-the-fact observations were not sufficient to satisfy the statute's requirement that an arresting officer be present to observe the commission of a misdemeanor as it happens. When an officer watches a video of a misdemeanor that has been committed earlier, the offense is not 'committed ... in the presence of the officer' as the statute requires.").

**b.**    In the loitering context, Florida courts decline to consider complainant reports for a second reason too: "the statute is forward-looking, rather than backward-looking in nature. Its purpose is to punish a certain type of incipient criminal behavior before it ripens into the commission or attempted commission of a substantive criminal act." *D.A.*, 471 So.2d at 151. As *Ecker* explained, the statute's purpose is to prevent incipient crime *before* it occurs. *Id*. As a result, the statute "is not directed at suspicious after-the-fact criminal behavior which solely indicates involvement in a prior, already completed substantive criminal act." *Id*.

33

The upshot is that, where an officer has evidence only of *prior* but not *incipient* criminal activity, that does not constitute a violation of the statute. For example, in *V.E. v. State*, 539 So.2d 1170 (3d Cir. 1989), the court found that the first element of the statute was not met because the defendant "was merely walking down the sidewalk when the officer came upon him. While it is true that the officer had information that the youth had been involved in arguably suspicious behavior (looking into the woman's window while his friend tried the door) some twenty minutes before the officer saw him, the purpose of the loitering and prowling statute is 'to punish a certain type of incipient criminal behavior before it ripens into the commission or attempted commission of a substantive criminal act.'" *Id.* at 1171–72 (quoting *D.A.*, 471 So.2d at 151).

Similarly, in *J.S. v. State*, 147 So.3d 608 (Fla. 4th DCA 2014), the court found that the first element was not satisfied where the defendant was walking at 4:00 a.m. in a residential area with no one else around. *Id.* at 609. That conduct did "not indicate 'incipient behavior' pointing towards the threat of an *immediate, future* crime." *Id.* at 610. And that was true even though he "matched the description of the BOLO for the earlier burglary and was in the same area," and even though he "took off

34

running" when the officer stopped him, since there was no evidence that he was about "to commit *another* burglary." *Id*. at 609–10.

**c.** Applied here, the complainant's observations must be discarded. Those observations did not occur in an officer's presence. And Officer Sanchez himself did not observe any *incipient* criminal activity. That Sanchez was responding to a complaint, and that Mr. Grandia Gonzalez matched the complainant's description of the suspect, cannot change that Officer Sanchez himself did not observe any conduct even arguably constituting loitering and prowling under Florida law.

### 4.    The Offense Must Be Completed Before Police Action

Once the complainant's account is discarded, that leaves only the officers' own observations. Again, before stopping Mr. Grandia Gonzalez, Officer Sanchez observed only that a male was walking down the street at 5:22 a.m. He saw nothing else. (DE 63:16–17). And that innocuous conduct does not come close to violating the statute. *After* Officer Sanchez stopped Mr. Grandia Gonzalez and Officer Exantus arrived at the scene, the officers did make further observations. But, under Florida law, they do not affect the analysis above: they have no bearing on the first element at all; and, as explained below, they cannot be considered for the second.

Under Florida law, "[t]he offense of loitering and prowling must be completed before any police action occurs." *Stephens v. State*, 987 So.2d 182, 184 (Fla. 2d DCA 2008).[7] That includes: suspicious activity that officers observe; suspicions items that officers discover; and statements that officers hear. Where those circumstances arise *after* the police take action, Florida law is clear that they cannot contribute to the heightened alarm or concern required to satisfy the second element of the offense.

For example, in *Hollingsworth*, the police initially observed the defendant "walking alone on a public street at 10:00 p.m. in an area surrounded by closed business." 991 So.2d at 992. That conduct did not violate the statute. *Id*. But "[a]fter noticing the deputies' presence, Ms. Hollingsworth proceeded at a fast pace in the opposite direction, turning back around the corner from where she came. The deputies then followed Ms. Hollingsworth in their respective vehicles and observed her duck behind a parked van. One of the deputies exited his vehicle and ordered

---

[7] *Accord, e.g.*, *E.F.*, 110 So.3d at 105; *D.S.D.*, 997 So.2d at 1194; *Hollingsworth v. State*, 991 So.2d 990, 991 (Fla. 4th DCA 2008); *Bowser*, 937 So.2d at 1272; *J.S.B.*, 729 So.2d at 457; *E.C. v. State*, 724 So.2d 1243, 1245 (4th DCA 1999); *Von Goff v. State*, 687 So.2d 926, 928 (Fla. 2d DCA 1997); *R.D.W.*, 659 So.2d at 1194; *T.T. v. State*, 572 So.2d 21, 22 (Fla. 4th DCA 1990); *E.B.*, 537 So.2d at 150.

Ms. Hollingsworth to stop. She continued, however, to walk at a fast pace in the opposite direction." *Id*. at 911. The court reversed, finding that, although the defendant "attempted to conceal herself, this conduct occurred after the deputies started to pursue her, not when she was first observed. Her response to the police pursuit cannot be used retroactively to support an imminent suspicion of criminal activity." *Id*. at 992.

Similarly, officers sometimes discover weapons or suspicious items after conducting a pat down or a search incident to arrest. But that discovery occurs *after* the police took action. So Florida appellate courts routinely hold that such a discovery cannot be used to retroactively establish the second offense element. *See, e.g.*, *E.F.*, 110 So.3d at 103, 105 ("burglary tools"—namely, "pieces of copper piping, a pair of bolt cutters, a pair of gloves, screwdrivers, and a hammer"); *Stephens*, 987 So.2d at 184 (small knife); *Bowser*, 937 So.2d at 1272 (screwdriver); *E.C.*, 724 So.2d at 1245 (twelve-inch screwdriver); *T.W.*, 675 So.2d at 1019 (chain saw); *E.B.*, 537 So.2d at 149–50 ("wrench and a pair of bolt cutters").

The same holds true for statements made to officers. For example, in *R.D.W.*, the officers observed the defendant and others riding their bikes at 9:20 p.m. through grocery store parking lots, scanning the lots,

37

and hiding their bikes in bushes, all while wearing jackets in August. 659 So.2d at 1193. The court held that this conduct was "insufficient to establish a prima facie case of guilt" for the second element because nothing "indicated that a breach of the peace was imminent or that public safety was threatened." *Id*. at 1194. Notably, that conclusion was unaffected by the fact that "a gun was found on one of [the defendant's] companions," and the defendant "told officers during questioning that the boy in possession of the gun had been planning to do something crazy." *Id*. Because that statement (and the gun itself) were revealed only after police action, they could not retroactively violate the second element.

That rule applies with special force to a defendant's failure to explain his presence. That is so because "the failure of a defendant to explain his presence and conduct cannot constitutionally be considered as a circumstance tending to establish this second element." *D.A.*, 471 So.2d at 154. Instead, after that element is independently met, a defendant who adequately explains his presence (or is not afforded the opportunity to do so) then has a defense. *See Ecker*, 311 So.2d at 110.

Thus, Florida cases routinely hold that inadequate or dubious explanations given to the police cannot be used to satisfy the second

38

element.[8] For example, in *T.W.*, the defendant was walking at 4:00 a.m. from the side of a building next to a closed pawn shop, and an officer observed that he "was carrying a black chain saw case." 675 So.2d at 1018. The man "told the deputy that he had just purchased the saw from an unknown person on the beach." *Id*. The court held that the state "did not prove the second element" because, while the defendant's explanation "did not dispel [the officer's] fear for the safety of the community," and the while the officer thought that the defendant "may have stolen the chain saw," the "failure to explain his possession of the chain saw is not an element of loitering and prowling." *Id*. at 1018–19.

---

[8] *See, e.g.*, *C.H.S. v. State*, 795 So.2d 1087, 1091 (Fla. 2d DCA 2001) ("the fact that the officer did not think that the boys gave a reasonable explanation for their presence does not provide support for the conviction because an insufficient explanation is not an element of the crime"); *K.R.R.*, 629 So.2d at 1070 ("an insufficient explanation does not help the state since it is not an element of the crime"); *T.T.*, 572 So.2d at 22 ("Suffice it to say, the juvenile's belligerency and the officer's disbelief in the [defendant]'s explanations, all coming after the stop, cannot be used to support the charge of loitering and prowling."); *V.E.*, 539 So.2d at 1171–72 (second element not satisfied, even though defendant and friend gave inconsistent answers as to why they were in the area); *Chamson v. State*, 529 So.2d 1160, 1160–61 (3d DCA 1988) (failure to explain presence in the area could not supply probable cause where defendant was observed crouching in a public alley).

Similarly, in *Bowser*, an officer observed the defendant and his friends walking down the street at 2:00 a.m., looking inside unoccupied cars in dark parking lots. 937 So.2d at 1271. "When [the officer] asked Bowser what he was doing, Bowser said that he was on his way home. When Bowser later identified his home as being in the opposite direction, the officer decided that he did not believe that Bowser was on his way home." *Id*. Notwithstanding "the police officer's discovery upon questioning Bowser that Bowser seemed to taking a roundabout route home," that fact did "not affect [the] analysis" for the second element, because "the offense of loitering and prowling must be completed prior to any police action." *Id*. at 1272 (quotation omitted).

In this case, the officers testified that Mr. Grandia Gonzalez did not adequately explain his presence in the neighborhood. But that failure does not change the fact that Mr. Grandia Gonzalez was not engaged in any incipient criminal activity to begin with, as required to satisfy the first element. And, in any event, the Florida cases discussed above hold that even an inadequate explanation for one's presence in an area cannot be used to retroactively satisfy the second element, since it occurs after police action (and such explanation cannot be constitutionally required).

40

In that regard, Officer Exantus testified that he was "alarmed" because of the complainant's report. (DE 63:30). But, again, the officers themselves did not observe any of the conduct reported by the complainant. So that report cannot be used to establish the second offense element. Officer Exantus also testified that the address on the ID failed to dispel his alarm, leading to the arrest. But there was no alarm that had to be dispelled in the first place. As explained, there was no conduct that occurred in the officers' presence, before they took action, that satisfied the second element. Although the point is academic given the clear failure to satisfy the first element, the district court erred by suggesting that the inadequate explanation both created the requisite "alarm" for the second element and also failed to dispel it. (DE 63:94–95)

\*   \*   \*

In sum, Mr. Grandia Gonzalez did not commit the misdemeanor offense of loitering and prowling in an officer's presence. To eliminate any possible doubt, he has thoroughly analyzed Florida law. But a treatise is unnecessary here. The facts are undisputed. The cases are unambiguous. And the conclusion is obvious: walking down the street is simply not a crime. Thus, this case turns on the Fourth Amendment issue below.

41

**B. The Fourth Amendment Prohibits Warrantless Arrests for Misdemeanors Unless the Offense Is Committed in an Officer's Presence**

Because Mr. Grandia Gonzalez did not commit loitering and prowling in an officer's presence, the question becomes: does the Fourth Amendment itself prohibit a warrantless arrest for a misdemeanor where the offense is not committed in an officer's presence? It does indeed.

As an initial matter, Mr. Grandia Gonzalez acknowledges that Florida law does not resolve this issue. As discussed above, Florida law requires that, for a warrantless arrest to be lawful, a misdemeanor offense must be committed in an officer's presence. Fla. Stat. § 901.151(1). However, the Supreme Court has held that an arrest made in violation of state law does not necessarily constitute a violation of the Fourth Amendment. *Virginia v. Moore*, 553 U.S. 164, 166, 176 (2008); *see United States v. Goings*, 573 F.3d 1141, 1142–43 (11th Cir. 2009) ("under the Supreme Court's decision in *Moore*, it was irrelevant for purposes of the Fourth Amendment whether Goings's arrest violated state law, so long as it was supported by probable cause"). Thus, to prevail here, Mr. Grandia Gonzalez must demonstrate that the Fourth

Amendment—independently and of its own force—prohibits warrantless arrests for misdemeanors that are not committed in an officer's presence.

In that regard, he also acknowledges that this question is an open one—both in the Supreme Court and in this Circuit. The Supreme Court reserved that question in *Atwater v. City of Lago Vista*, 532 U.S. 318, 340 n.11 (2001) ("We need not, and thus do not, speculate whether the Fourth Amendment entails an 'in the presence' requirement for purposes of misdemeanor arrests."). And this Court reserved that question in *Knight v. Jacobson*, 300 F.3d 1272, 1276 n.3 (11th Cir. 2002) ("Knight has not argued, and so we do not decide, whether an arrest for a misdemeanor not committed in the officer's presence violates the Fourth Amendment itself irrespective of state law."). But while that question is technically an open one, existing Supreme Court precedent effectively resolves it.

## 1.    The Common Law Is Dispositive

Supreme Court precedent already establishes that: the common law contained an "in-the-presence" requirement for misdemeanor arrests; and the Fourth Amendment cannot be less protective than that.

**a.**    In *Kurtz v. Moffitt*, 115 U.S. 487 (1885), the Supreme Court expressly identified the common law rule: "By the common law of

43

England, neither a civil officer nor a private citizen had the right, without a warrant, to make an arrest for a crime not committed in his presence, *except in the case of felony*, and then only for the purpose of bringing the offender before a civil magistrate." *Id*. at 498–99 (emphasis added).

This was not a passing comment. Rather, the Court cited numerous historical authorities to support that proposition, including Blackstone, Hale, and two English cases. *Id*. at 499. Nor was this an isolated comment. To the contrary, for the next century, the Supreme Court has cited *Kurtz* with approval and adhered to the view that the common law included an "in-the-presence" requirement for misdemeanor arrests.

The Court did so just 15 years later in *John Bad Elk v. United States*, 177 U.S. 529 (1900). Referencing a South Dakota statute, the Court observed that "the common law is therein substantially enacted." *Id*. at 535. In the margin, the Court quoted the statute, which authorized arrests "[f]or a public offense committed or attempted in his presence" and arrests "[w]hen the person arrested has committed a felony, although not in his presence." *Id*. at 535 n.†. Under the common law, then, there was an "in-the-presence" requirement for misdemeanors but not felonies.

44

The Court adhered to that view 25 years later in *Carroll v. United States*, 267 U.S. 132 (1925). There, the Court said this: "The usual [common-law] rule is that a police officer may arrest without warrant one believed by the officer upon reasonable cause to have been guilty of a felony, and that he may only arrest without a warrant one guilty of a misdemeanor if committed in his presence." *Id.* at 156–57. The Court could not have been more clear. In so stating, the Court approvingly cited both *Kurtz* and *John Bad Elk*. *Id.* at 157. And it block quoted a reformulation of the same common-law rule from an English treatise. *Id.*

The Court in *Carroll* even proceeded to explain the *reason* for the misdemeanor-felony distinction: "The reason for arrest for misdemeanors without warrant at common law was promptly to suppress breaches of the peace, while the reason for arrest without warrant on a reliable report of a felony was because the public safety and the due apprehension of criminals charged with heinous offenses required that such arrests should be made at once without warrant." *Id.* (internal citation omitted).

Another quarter-century later, four Justices joined an opinion strongly reiterating the common-law rule: "Under the English common law, a police officer had power without a warrant to arrest persons

45

committing a misdemeanor in the officer's presence and persons whom the officer had reasonable cause to believe had committed a felony." *Trupiano v. United States*, 334 U.S. 699, 713 (1948) (Vinson, C.J., dissenting). Chief Justice Vinson continued: "This rule, which had its origin in the ancient formative period of the common law, was *firmly established* at the time of the adoption of the Fourth Amendment. Since that time it has received general application by state and federal courts. Indeed, this Court has heretofore given specific recognition to the rule." *Id*. (emphasis added; footnotes omitted). For support, he cited *Carroll* and *Kurtz*, as well as several historical authorities. *Id*. at 713 & nn.4–6.

Another quarter-century later—and now nearly a full century after *Kurtz*—the Supreme Court again acknowledged the common-law rule in *United States v. Watson*, 423 U.S. 411 (1976). In that case, the Court upheld a federal statute authorizing warrantless arrests for felonies. In doing so, the Court emphasized that this practice was consistent with its precedents and, in turn, the common law. *Id*. at 416–17. Again citing numerous historical authorities, including Blackstone and Hale, the Court repeated the rule: "The cases construing the Fourth Amendment thus reflect the ancient common-law rule that a peace officer was

46

permitted to arrest without a warrant for a misdemeanor or felony committed in his presence as well as for a felony not committed in his presence if there was reasonable ground for making the arrest." *Id*. at 418. Even the dissenting Justices agreed that "[t]he common law was indeed as the Court states it." *Id*. at 439 (Marshall, J., dissenting).

Another quarter-century later, the Supreme Court reiterated the common-law rule again in *Atwater*. In that case, the Supreme Court held that the Fourth Amendment did not prohibit warrantless arrests for misdemeanors. *Atwater*, 532 U.S. at 323. Specifically, the petitioner argued that warrantless arrests could be made only for misdemeanors involving breach of the peace because the common law was so limited. *Id*. at 326–27. The Court did not accept petitioner's historical account of the common law; at best, the common law was equivocal. *See id*. at 327–345. In the course of that discussion, the Court observed: "although [it] has not had much to say about [common law] warrantless misdemeanor arrest authority, what little [it] [has] said" had "focused on the circumstance that an offense was committed in an officer's presence, to the omission of any reference to a breach-of-the-peace limitation." *Id*. at 340. For support, the Court favorably cited the statement of the

47

common-law rule in *Watson*, *Carroll*, *John Bad Elk*, and *Kurtz*. *Id*. at 340–41. While the Court reserved on the Fourth Amendment question here—noting that Justice White had previously opined that the Fourth Amendment did *not* include an "in the presence" requirement—the Court reaffirmed its understanding of the common-law rule. *Id*. at 340–41 n.11.

**b.** That common-law rule is dispositive of the question here. The Supreme Court has recently explained that the Fourth "Amendment 'must provide *at a minimum* the degree of protection it afforded when it was adopted.'" *Lange v. California*, 141 S. Ct. 2011, 2022 (2021) (emphasis in original; quoting *United States v. Jones*, 565 U.S. 400, 411 (2012)). To ascertain that minimum degree of protection, the Supreme Court "look[s] to the statutes and common law of the founding era," for those authorities reflect "the norms that the Fourth Amendment was meant to preserve." *Moore*, 553 U.S. at 168. Indeed, "Joseph Story, among others, saw the Fourth Amendment as 'little more than the affirmance of a great constitutional doctrine of the common law.'" *Id*. at 169 (quoting 3 *Commentaries on the Constitution of the United States* 748 (1833)).

"Sometimes, no doubt, the common law of the time is hard to figure out: The historical record does not reveal a limpid legal rule." *Lange*, 141

48

S. Ct. at 2022. Where the common-law inquiry "yields no answer," the Court "evaluate[s] the search or seizure under traditional standards of reasonableness." *Wyoming v. Houghton*, 526 U.S. 295, 299–300 (1999).

But that is not the case here. For over a century, the Supreme Court has repeatedly reaffirmed the common-law rule. And where, as here, the common law is clear, the common law is also dispositive. *See, e.g.*, *Wilson v. Arkansas*, 514 U.S. 927, 934 (1995) ("Given the longstanding common-law endorsement of the practice of announcement, we have little doubt that the Framers of the Fourth Amendment thought that the method of an officer's entry into a dwelling was among the factors to be considered in assessing the reasonableness of a search or seizure."). In short, because the Supreme Court has repeatedly recognized that the common law contained an "in the presence" requirement for misdemeanor arrests, so too must the Fourth Amendment.

In fact, the Supreme Court has already indicated as much in dicta. In *Atwater*, the Court concluded: "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense *in his presence*, he may, without violating the Fourth Amendment, arrest the offender." 532 U.S. at 354 (emphasis added). The

49

Court repeated that conclusion multiple times in *Moore*. 553 U.S. at 171, 176, 178. And, in *Maryland v. Pringle*, 540 U.S. 366 (2003), the Court again repeated that point, distinguishing between misdemeanors and felonies. *Id*. at 370 ("A warrantless arrest of an individual in a public place for a felony, or a misdemeanor committed *in the officer's presence*, is consistent with the Fourth Amendment if the arrest is supported by probable cause.") (emphasis added). The clear implication is that, if the misdemeanor is *not* committed in an officer's presence, the warrantless arrest is *not* reasonable. That would neatly track the common-law rule.

### 2.    Contrary Authority Is Unpersuasive

Although Supreme Court precedent effectively resolves the issue, Mr. Grandia Gonzalez acknowledges that "every circuit that has addressed the issue has held that the Fourth Amendment does not include an in-the-presence requirement for warrantless misdemeanor arrests." *Knight*, 300 F.3d at 1276 n.3. So too did two Justices in *Welsh v. Wisconsin*, 466 U.S. 740, 756 (1984) (White, J., joined by Rehnquist, C.J., dissenting). However, as Chief Judge Sutton later explained, "no court has devoted much more than a line or two to this issue." *Graves v. Mahoning Cnty.*, 821 F.3d 772, 778–79 (6th Cir. 2016) (collecting cases).

50

Attempting to identify "sound reasons" for the majority position, he observed that, in rejecting a breach-of-the-peace restriction in *Atwater*, the Court found the common law conflicting on the warrantless misdemeanor arrest power. *Id*. at 779. But while the common law may have been ambiguous with regard to any breach-of-the-peace limitation, it is not ambiguous with regard to an in-the-presence requirement. Chief Judge Sutton cited a few historical sources to the contrary. *Id*. But this Court may not second-guess the Supreme Court's historical account of the common law, which has been consistently expressed in precedents extending back well over a century. Chief Judge Sutton also questioned the continuing utility of the common-law distinction between felonies and misdemeanors. *Id*. But the Supreme Court in *Lange* very recently constitutionalized that common-law distinction, holding that the Fourth Amendment categorically permits warrantless entries into the home for fleeing felons but *not* for fleeing misdemeanants. 141 S. Ct. at 2023–24.

Most revealingly, Chief Judge Sutton acknowledged that "there are valid competing arguments that deserve to be addressed." *Graves*, 821 F.3d at 779. Although an understatement, he acknowledged that the Supreme Court and other sources had recognized that the common law

51

included an "in-the-presence" requirement, and the common law "often tells us what is reasonable under the Fourth Amendment." *Id*. at 779–80. He further observed that several state courts had struck down statutes authorizing warrantless misdemeanor arrests without such a requirement. *Id*. at 780 (citing cases); *see* William A. Schroeder, *Warrantless Misdemeanor Arrests and the Fourth Amendment*, 58 Mo. L. Rev. 771, 790–91 & nn.39–40 (1993) (noting state court disagreement). Ultimately, Chief Judge Sutton did not purport to resolve the debate, for it was not an open question in the Sixth Circuit. But it is an open question in this Circuit. And, as explained, that question is dispositive of this case.

\* \* \*

In the end, no authority taking a contrary view has refuted what the Supreme Court has consistently said: the common law contained an "in-the-presence" requirement for misdemeanor arrests. And no contrary authority has explained why that common-law protection should not be incorporated into the Fourth Amendment. Because the Supreme Court has consistently recognized that common-law rule, and because the Supreme Court has held that the Fourth Amendment cannot be less protective than the common law, Supreme Court precedent effectively

52

resolves the dispositive issue here. Bound by that precedent, this Court should hold that the Fourth Amendment prohibits warrantless arrests for misdemeanors that are not committed in an officer's presence. Here, because the misdemeanor offense of loitering and prowling was not committed in an officer's presence, the warrantless arrest of Mr. Grandia Gonzalez violated the Fourth Amendment. The evidence and statements obtained as a result of that unlawful arrest should have been suppressed.

## CONCLUSION

For the foregoing reasons, Mr. Grandia Gonzalez requests that the Court reverse the district court's ruling denying his motion to suppress, vacate the judgment below, and remand for further proceedings.

Respectfully submitted,

MICHAEL CARUSO
FEDERAL PUBLIC DEFENDER

*/s/ Andrew L. Adler*
ANDREW L. ADLER
ASHLEY KAY
ASS'T FEDERAL PUBLIC DEFENDERS
Counsel for Appellant
1 E. Broward Blvd., Suite 1100
Ft. Lauderdale, FL 33301
(954) 356-7436

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), because it contains 11,435 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in New Century Schoolbook 14-point font.

*/s/ Andrew L. Adler*

54

## CERTIFICATE OF SERVICE

I certify that on this 4th day of August 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, and it is being served this day via CM/ECF on Daniel Matzkin, Assistant U.S. Attorney, 99 N.E. 4th Street, Suite 523, Miami, FL 33132.

*/s/ Andrew L. Adler*